May it please the Court, Counsel, Mr. Villanueva was prohibited from presenting the cornerstone of his defense. The error is of constitutional magnitude. Villanueva could not present the linchpin of his defense in a first-degree murder case resulting in life without parole. The stakes could not be greater. The defense has always been one of misidentification. The only evidence presented by the government not severely discredited are the eyewitnesses at issue in this appeal. The Court denied powerful expert testimony to expose the unreliability of the identifications at issue. U.S. v. Kime multiple times references eyewitness testimony as being powerful in nature. Mr. Villanueva was denied from presenting that. Science beyond the ken of the jury is why the eyewitness testimony went unchecked. Studies, examinations across the country unambiguously show that cross-examination and jury instructions do not adequately safeguard a defendant's right to a fair trial when dealing with eyewitness identification under impermissibly suggestive circumstances. Counsel, what about all the other, there's a lot of consciousness of guilt evidence, you know, in terms of threatening witnesses, writing letters, and all of that. I don't understand that to have been discredited. You mentioned that all the other evidence was discredited. Why, and that's just part of the other evidence, why doesn't the other evidence, you know, make a difference here under our rule that says there has to be no other evidence other than the uncorroborated eyewitness testimony? Sure, Your Honor. And the rule referred to is contained in United States v. Kime and United States v. Nicholas. But specifically, the letters with regard to consciousness of guilt alluded to by the Court were discredited in Mr. D'Souza's testimony. So that evidence came in through Mr. D'Souza. Mr. D'Souza, as the Court will recall, is essentially an individual who has made a habit of testifying against defendants charged with first-degree murder. He did the same thing in a death penalty case in the District of Colorado. That point was made clear to the jury, and it discredited any portion of testimony he gave, including the consciousness of guilt referenced by yourself, Judge Strauss. What about the fingerprints in the burned-out car? Was that discredited as well? It was, Your Honor. It was discredited by multiple witnesses. Indisputably, that vehicle was at Mr. Villanueva's apartment in Colorado weeks before the murder occurred. The expert testimony unambiguously states we can't time stamp a palm print. And so by virtue of that testimony, undisputedly, Mr. Villanueva's palm touched that gold Honda, specifically, at his house in Denver, which has nothing to do and in no way implicates him in the murder. The science here is beyond the ken of the jury. The studies, again, unambiguously show this. The science specifically referenced in Ms. Laney's report, the mis- Do you have a case where such an expert and the testimony about reliability of photo identification was admitted and was upheld? I do, Your Honor. Or is this, are you asking the court to break new ground here? I don't think new ground has to be broke, Your Honor. I think under the line of cases that exist in this circuit at this time, no new ground has to be broke. Perry v. New Hampshire, the United States Supreme Court case in 2012, references several safeguards available to defendants in addition to cross-examination, in addition to jury instructions. Specifically, Perry v. New Hampshire provides instruction that State and Federal trial judges are allowed to exclude the evidence at issue under the rules of evidence. Mr. Villanueva made appeal to that safeguard. Also, the Perry v. New Hampshire court stated that with regularity, citing State v. Clopton, expert eyewitness testimony will be admitted, especially when dealing with stranger identifications, I believe, is the express term utilized by that court. But because it's due process, isn't it only applicable, Perry, by its terms to government-run suggestive eyewitness identification, not private parties not acting at the behest of government? Sure. And I think, Judge Strass, what you're getting at is the lack of police involvement and the impact that has on the outcome of this case, am I understanding you correctly? Yeah. First of all, I am not going to concede that there was a lack of police involvement in this case or intentional disregard. Mr. Villanueva requested the opportunity to question law enforcement outside the presence of the jury, and he never got it. His only opportunity to question law enforcement on this specific issue was in front of the jury. That said, the lack of police involvement is not, it doesn't change the science. The lack of police involvement, as stated in Ms. Laney's report and articulated by different jurisprudence across the country, is that the reliability from a scientific standpoint doesn't change based off of law enforcement, law enforcement involvement or lack thereof. So from a fundamentally unfair trial standpoint, long-winded answer, Judge Strass, the answer to that is no. The thrust of the government's argument in response to this appeal centers on three things, the right to cross-examination, the Daubert standard, and hold harmless, as alluded to by the court. Cross-examination is not a vehicle through which Mr. Villanueva's defense could be presented. The issue, again, has been studied on a national level, consistent with the controlling safe Perry v. New Hampshire. Safeguards are built into our system, safeguards beyond cross-examination. Safeguard number one, exclude the suggestive identification. Mr. Villanueva attempted to seek that relief. That relief was not provided. Safeguard number two, permit defendants to present expert testimony on the hazards of trial. That was presented in this case. Less suggestive circumstances were presented in a Second Circuit case, U.S. v. Nolan. That was a 2020 case. In that case, the appellate court essentially found that trial counsel was ineffective, reversed the conviction, remanded it back on two grounds. Ground number one, trial counsel failed to object to the admission of the at-issue identification. Ground number two, trial counsel failed to notice up expert testimony to explain to the jury the science behind the suggestive identification at issue. Are we going to promulgate a standard which would constitute an effective assistance to counsel elsewhere in the country? The trial court has broad discretion in balancing the reliability and probative value against its prejudicial effect. The initial expert disclosure in this case, Doc 549, states, quote, Dr. Laney will testify on identification procedures, eyewitness memory, human memory, and factors that influence and predict the reliability or unreliability of eyewitness testimony. This is information that is beyond the ken of the jury, and it does not invade the jury's province. I see my, I have run out of time. I'd like to save some for rebuttal. Thank you. Before you do that, let me just clarify. We typically wouldn't hear all three lawyers in rebuttal. Have the three of you worked out how you're going to handle rebuttal? My understanding, subject to the court's approval, of course, is that because all of our opportunity for rebuttal, but if the court doesn't want to go that route, I will defer to the court, of course. All right. Thank you for your argument. Thank you. Mr. Andrews, we'll hear from you. Good morning. May it please the court, counsel. What we have here is obviously a very different issue than what we've seen before. It's a fairly straightforward question in terms of sentencing. In this case, what happened was that in pronouncing sentencing on Mr. Becerra, the judge, the sentencing judge, repeatedly made erroneous statements that he stated were based on the testimony of trial witnesses that Mr. Becerra pointed his AK-47 at the onlookers, essentially terrorizing them as part of an effort to assist his co-defendants in committing the murder of Vinny Brewer. Unfortunately, the record is absolutely clear that there was no testimony that Mr. Becerra actually did that, and yet the court repeatedly came back to that issue as something that was clearly animating the court in its decision to sentence him to the statutory maximum of 15 years. What about the PSR? My understanding is the PSR talked about them as a group and said pointed their guns, their firearms, excuse me, at a bystander, and then that wasn't objected to. Right. I would note it was not objected to by either side. I guess in reading the PSR where it referred to the group as opposed to singling out Mr. Becerra individually, you know, that becomes one of those judgment calls, Your Honor. You know, do you start picking at the PSR and risk an acceptance of responsibility when it's not an issue that specifically addressed Mr. Becerra? Was the decision made that, okay, you could say the group, so I don't think that necessarily accounted for Mr. Becerra, and that was not anything that was, again, the court was very clear that this was based primarily on the testimony of Mr. Casillas, referenced that again and again, when in fact Mr. Casillas, excuse me, was the only one who did point a weapon at the crowd. So I think as this Court pointed out, and I believe it's the case, there could be grounds on which the Court would sentence him to the statutory maximum. But if you're relying on clearly erroneous grounds, which these were, I don't think there's any dispute, the government doesn't dispute that Mr. Becerra did not, in fact, there was no testimony that Mr. Becerra had pointed his gun at the onlookers or anything like that, that if you're relying on an erroneous statement, it essentially infects the entire proceeding. There's no way to parse that out in hindsight. You can't judge, well, he probably, you know, 40 percent this was the inaccurate, but everything else was on the level. There's no way to do that. It has to be remanded for resentencing. The other issue where we believe the Court was in error was in terms of, well, obviously, this infected the first prong of 3553A, which was, you know, the nature and circumstances of the offense. If in considering the circumstances of the offense, the Court is saying that Mr. Becerra did something which he did not, in fact, do. What about the wasn't there testimony, Becerra pled guilty? He pled guilty to accessory after the fact, yes, sir. Okay. And then, but Corona and Villanueva were tried. Correct. Wasn't there testimony in the trial going to Becerra pointing the gun at the crowd? No. The Court specifically said that was the testimony of Mr. Casillas. It was not, in fact, his testimony. He did not say that at all. So the district court got that wrong? Yes, sir. Just quite simply, yes. There was no witness at the trial. The Court later identified, in considering the reconsideration, the Sky Brewer, who said that, A, one of the individuals had pointed a gun at, I think, her and her child. But there was no positive identification that it was Mr. Becerra. In fact, one of the reasons the government made, agreed to make the deal with Mr. Becerra that it did, and it said that right on the record of the sentencing, is because there were issues in terms of his, in terms of his... If you're wrong about that, was the district court warranted and was it permissible for the court to consider that evidence? I'm sorry, sir. Let's just assume you're wrong and that there was testimony in the trial to this effect. Could the district court, in your client's case, take that into consideration? Well, obviously, Your Honor, the district court can consider whatever testimony there was at the trial. I mean, we have the factual basis statement, but if there was more information that came out at the trial that amplified that, that would be fair game. I don't think there's any question about that. But the court can't rely on facts that weren't actually presented during the trial, either. I think that'd be the flip side of that argument. Sure. Thank you. All right. Thank you. So, anyway, our position is that because of the reliance on what I don't think anyone really disputes is an inaccurate recollection of the trial, we believe a remand and resentencing is warranted. I would also submit we argued here that there was another issue in terms of the balancing factors. Obviously, if you're relying on factors that were not presented at trial, that's going to affect the first prong of 3553A. There's also the other issue in terms of assessing the culpability of the defendants. We had argued both in the sentencing memo and at the sentencing that relative to his other defendants, excuse me, specifically Mr. Tuttle and Ms. Garnier, Ms. Garnier pled guilty to the same offense of the accessory after the fact, that the court did not adequately try to balance the difference between the culpability of these individuals. Specifically, regarding Ms. Garnier, even the government said that they viewed her culpability as far more than that of Mr. Becerra, yet the court declined to address that issue and just said, I'm not going to get into parsing out the differences between Ms. Garnier's and Mr. Becerra's, which we submit was an abuse of discretion that should have addressed that. We articulated very specific reasons why Ms. Garnier certainly would deserve a higher sentence than Mr. Becerra for no other reason. She was the individual, and the testimony seemed clear on this, that actually identified Mr. Brewer at the scene. None of the other defendants knew him, and if she did not pick him out at that scene at the Big Crow Center, essentially, this wouldn't have happened, whereas Mr. Becerra, while he aided and abetted and he did strike the victim at the scene, quite frankly, if he wasn't there, the thing would have gone down exactly the same as it had before. And for the court not to consider that and to give Mr. Becerra the same statutory maximum sentence as it gave Ms. Garnier, my position is abuse of discretion is not evidence of Mr. Becerra pointing the gun. This is on plain error review, correct? Our position is it should be abuse of discretion, Your Honor, because we weren't in a position to raise an objection to that because neither Mr. Becerra or I were at the trial. The party who knew or should have known that information was false was the government, and they didn't make any effort to correct the record, although, quite frankly, I think an error of this nature, particularly as the court pointed out in the Birtling decision, whether you're looking at plain error or abuse of discretion, it merits a reversal and a resentencing. And I see I've got a minute, 37 seconds left, so if you want to start. Why doesn't the order on the motion to reconsider resolve this problem? That was the first time you raised it with the judge, and then the judge addressed the record after the fact, Your Honor, but at the sentence. But you didn't object at the sentence, so he had no reason to. But we couldn't object because we did not — we weren't at the trial. We didn't know what Mr. Casellas had testified to or not testified to at that time. The party who knew that would have been the government, and they sat quiet during it. I mean, you have to be present at the trial of the other people in order to object to the use of the testimony in your proceeding? I don't think the testimony would have been objectionable in and of itself had his recollection of the testimony been correct. So we're sitting there thinking the judge is saying Mr. Casellas testified to this fact. That is — I had no reason to doubt at that time that's what his testimony was. You didn't have a transcript? I did not have a transcript at that time, no, Your Honor. Nor did I think it would be necessary to get a transcript of the trial at that point. Why not? I just didn't anticipate this issue coming up, frankly. I'm not even sure at that point. Why did you file the motion to reconsider? I thought maybe we could short-circuit the issue of having to appeal it if the Court would simply — How did you come to the view that the statement, that sentencing was wrong? I — it came to my attention afterwards that that was not actually the testimony of Mr. Casellas. I don't recall at this point, Your Honor, how I came to that knowledge, but it was and I just — I don't recall who I heard it from. Well, why doesn't the order resolve the problem? Because in the order, the Court went back and tried to parse out the records and while Skye Brewer said that there was an incident where someone pointed a gun, but that's not what the Court said at the sentencing hearing. The Court was very specific in saying that you pointed this at the crowd. You terrified all of these people. This takes your conduct beyond the level of just someone who's merely an accessory after the fact. You terrified this peaceful village of people to help your co-defendants kill someone to collect the drug debt. That is not actually what the record said and that's why we think it should be — Okay. Thank you. — remanded for resentencing. Thank you for your argument. Thank you. Mr. Murphy. Good morning, Your Honors. Good morning, Counsel. What I'd like to focus on is the assertion by Mr. Corona that his pre-Miranda non-custodial interrogation was improper and that violated his Fifth Amendment rights. I want to focus on three findings made by the magistrate in the report and recommendations that were later adopted by the district court in denying his motion to suppress. The first was the finding — and this was on page 11 of the magistrate's report and recommendation — that the scope and the duration of the stop was strictly limited to investigating whether there was contraband in the vehicle. And I think this finding is important because it ignores the greater context of the case and of the stop — the stop which ultimately led to the seizure of my client, which ultimately led to his pre-Miranda confession to ownership of a gun that was utilized during the murder of Vinnie Brewer. So it was of significance to the total case. Because the finding by the court suggests that the officers involved in this investigation who seized my client and interrogated him had some reason to believe, some specific articulable facts to believe that contraband was, in fact, in this vehicle. And that's not the case. That's not the context. This was a pretextual stop, and the seizure of my client and the questioning him about contraband, specifically drugs and weapons, was really based on complete whim or bias or prejudice or whatnot. Recall, this was a case where the vehicle was stopped for a minor regulatory offense, having an expired dealer plate. The officers had no reason to believe that any of the occupants of this vehicle had been involved in any criminal activity other than this minor offense, which they acknowledged is paid as a fine, is not something they ordinarily stop people for. Yet in this case, they stopped the vehicle in which my client was a passenger. So he's not even the target of the investigation of this expired dealer plate. He's just a passenger. But they happened to be driving in a low-income, high-crime area where gangs are involved. Now, that involves tens of thousands of people who live and drive in that neighborhood. They targeted this vehicle, but they came to the car. They knew none of the occupants. They didn't smell the odor of a drug emanating from the vehicle. They acknowledged they knew no one in the vehicle. Nobody made furtive gestures. Nobody tried to run. So they had no facts giving rise to the suspicion that any of the occupants in that vehicle had guns or drugs. What about the fact that your client was, well, very nervous, but it was actually manifesting in some strange behavior, shaking, and that it looked like he might try to run or fight. That was what the officers testified to. That's not enough to raise reasonable suspicion? No, because that happened outside the vehicle after they had already seized him, frisked him, cuffed him, and put him into the police vehicle. At the time he was in the vehicle, Officer K or, excuse me, Officer Garcia acknowledged within five seconds of approaching this vehicle, he had already targeted my client for follow-up investigation, which raises the question, investigation as to what? He hadn't seen my client do anything wrong. Well, I thought the question came up when the occupants were asked to identify themselves, right? Yes. And there's nothing wrong with that, would you agree? Would you agree that an investigating officer in a stop like this is permitted, constitutionally permitted, to obtain the identification of the occupants? That is the state of the law. So they do that, and then when they get Mr. Corona's ID, they become suspicious that he'd given a false name? Correct. Okay. So where, what's the problem with that? At that point, that still gives no basis for them to then do a full-scale search and an interrogation of him as to the existence of guns or drugs. Mind you, that conversation happened once he was already removed from the vehicle, put over the back of the car, frisked, cuffed, and taken to the patrol vehicle, and after he admits that he has warrants or he believes he has warrants. The officers, and it appears the magistrate and the district court, adopted the notion that right away, within five seconds of the initial stop, that Officer Garcia and Officer Kay were entitled to investigate and question him about contraband that might be in the vehicle. At that point, they had no reason to suspect anything of the sort. I mean, they point to things like that he had a Chicago White Sox baseball cap in his lap, which may or may not be associated with a particular gang that was operating in Denver. So they had nothing there. Now, Mr. Corona admittedly did give a fake name, and he explained to the officer because he thought he had warrants, which turned out to be false. Ultimately, we learned he didn't have warrants. But again, that doesn't give carte blanche to then go from there to a full-scale interrogation about guns and drugs. And I emphasize the drugs. I mean, that to me is a stretch to say that, because if somebody gives a false name, my first instinct is, what is he hiding? I mean, I think that's everyone's first instinct. And so if that's true, then it's possible he has some – maybe he has contraband on the person, although you said they did a frisk. Maybe there's contraband in the car. He's hiding something. We've got to figure out what that something is. Well, and that actually goes – dovetails right into the second finding is that the district court and the magistrate court said at that point the officers were entitled to ask investigative general questions to dispel their suspicions. But that's not what happened in this case. They didn't ask – well, one, they didn't have a suspicion of guns or drugs. They just had generalized suspicions. Why did you give a fake name? And he said, because I have warrants. And they weren't on the scene able to prove or disprove whether he did have warrants. But they took him at his word. They then said, or the court said, well, at that point, they could then interrogate him without the benefit of Miranda to dispel their suspicion. Well, if they suspected the individual crimes of possession of guns or possession of drugs, now it is an interrogation. It's no longer a general exploratory interaction. But if they suspect – if it's true that they suspect contraband of any type, right, he's already been removed from the car, there's a child in the car. Right. Doesn't that just – I mean, you may have some points about the findings, but – or what happened beforehand. But at that point, doesn't the public safety exception kick in? No. In this case – and that's – I appreciate this. This goes right into the third point I wanted to make. The public safety exception is a complete fiction in this case. And unlike other areas like United States v. Wren or Wyoming v. Wren, where you can do pretextual stops, there is no case law authorizing pretextual public safety searches. I would point the Court to page 52 and 53 of the transcript of the evidentiary hearing. Officer Garcia acknowledges he had no public safety concerns. He left the child and the other occupants in the vehicle for five minutes during his interrogation of my client. Had he believed, and he said that he had done this in prior cases, if he had had public safety concerns about the child in the car or anybody else or the officers, they would have removed the occupants from the vehicle. They would have made them sit by the curb. They could have done the Terry Pat down, et cetera. Isn't the test objective, though, not subjective for the public safety exception? It is, but there's no facts here. I mean, there was simply – the facts, objectively, were they left all of the occupants but Mr. Corona, the only adult male in the vehicle. They left all of them in the vehicle for five minutes unattended with no police monitoring. Had they had concerns about safety, they would have done something differently. He said, we didn't have any reason to be concerned. You can see it on the video. There's police milling around, no concern at all as to their own safety or what's going on in that vehicle until they interrogate Mr. Corona, at which point he admits there's a gun in the vehicle and it's mine, which was later tied to the murder of Vinnie Brewer. May I ask another question? Let's assume you're correct about all that. What's the prejudice to your client? The prejudice to my client was, unlike Mr. Roll's client, there was no eyewitness identification of my client at the scene, other than with Hector Casillas, who is the juvenile who's in that car, who says that the gun that my client admitted ownership to in Denver during this traffic stop. So this all goes to the gun. It goes to the gun, which is the only physical evidence that corroborated Mr. Casillas' assertion. It's not that multiple people testified that Mr. Corona was one of the men who shot Brewer. There weren't multiple witnesses who identified him. There was one. Mr. Casillas is the witness who identified my client. Why not harmless? This is your point on the search and the seizure of the gun and the introduction of the gun or whatever, this constitutional point that you're raising. Why is that just harmless here? Because the jury could accept the testimony, the eyewitness testimony. Because the avenue within which that gun came before the jury was through the only person who made an eyewitness identification of my client. It's the only thing that corroborated Hector Casillas' assertion that my client was the guy with the handgun who shot Mr. Brewer multiple times. So this physical evidence, which they used ballistic experts and whatnot to match to the shell casings and the bullet fragments, really put a forensic stamp of approval on Hector Casillas' otherwise highly discredited testimony. That's why it's not harmless. It's really the only thing that corroborated his statement. Thank you. I see I'm out of time.  Thank you for your argument. Yeah. Mr. Kelderman, we'll hear from you. May it please the Court and counsel. Your Honors, when it comes to the use of an expert testimony or use of expert testimony when it relates to eyewitnesses, this Court's precedent is very clear from Kime, Nicholas, other cases that have come down over the years that there's no preliminary judicial inquiry needed into the reliability of eyewitness testimony, particularly in situations like here, where that eyewitness's testimony is not the only thing that supports conviction. It's not the only thing that allows a jury to know what happened. In this case, Skye Brewer provided unequivocal testimony. He identified immediately, shortly after this shooting, he identified the individual that was in front of him, feet away from him, holding a gun to his head or at his cousin, as looking like Vanilla Ice, a light-skinned Mexican male that looked like Vanilla Ice. There was no law enforcement involvement in getting him to say that. There was nothing that pointed him in that direction where law enforcement took a photo lineup and showed it to him. This is a community, a place where people were shocked at what had happened. The shooting occurs, and Vinnie Brewer's sister is trying to figure out, who did this? Who killed my brother? She knows that Skye has said it's someone who looks like Vanilla Ice. There's other rumors, different things going on, where it's the East Side Oldies. So she goes to a website, finds a photograph, and just shows it. I think, I believe she gave Skye a link to look at it from Facebook, if I remember correctly. Can I ask you a question about our rule? Why allow expert, or at least suggest that we would allow expert testimony in a case that relies only on eyewitness testimony, but not do it in a case when there's other evidence? It seems to me that if we're looking at it from the juror's point of view, the juror is going to have the same problem, regardless of what other evidence is in the case, in assessing the weight to be given that testimony. It's almost, I have thought about that as well, Judge Strass. It's almost like it's a bit of a policy question, why that's the line that's been drawn. I have not been able to come up with a logical reason why that is the case. Like I said, I gave it thought, but I don't have an answer as to exactly what would be the reason for it. The thing is, what we do have is precedent from this Court, and that is what carries the day in this case. As the Court noted earlier, government involvement is when, I guess, cases like Perry, I think Peel is another case, when those holdings start to come into play. But there was no police involvement here. This was simply Tara Curry saying, here's a photograph, and it's got three people in it. She didn't suggest. In fact, the testimony from her and from Skye was that she did not suggest who it should be. She showed him a photograph. Do you see the shooter in this photograph? And he identified the person immediately, and then he did so at trial. Certainly, the case law and the reason that expert testimony is permitted in these circumstances, in some circumstances, has to do with the power of that testimony. And definitely it is. I mean, it's hearing from the guy who stood just feet away from the shooter right before the shooting happened, and I'm sure that's powerful. But that wasn't the only evidence. What about the argument, though, of opposing counsel that the evidence, and I know you're about to get into that other evidence, but when you do so, could you address the argument that a lot of this was discredited? In fact, all of it was discredited, according to opposing counsel. Well, just because it was contradicted does not mean that it was discredited, or just because defense counsel cross-examined on it. That's the whole. I mean, that's what these cases say over and over again, is that the way that you go up against eyewitness testimony is largely through cross-examination. It's for the jury, and it's their exclusive province under KINE. And so Robert DeSerza was a witness who testified that both Corona and Villanueva, and I guess it's particularly relevant here, Villanueva was someone who told him what had happened, not only told him what happened, wanted him to kill other individual witnesses, was trying to hire him. Okay? So there's a disagreement, I suppose, between the United States and defense counsel on how believable DeSerza was, but the evidence was believed in some way, whether it be DeSerza or whether it be H.C., the juvenile who was with these individuals, who said, I was right there. My job was to hold guns and keep the crowd back, to shoot someone if necessary, and the next thing I know, I hear gunshots, and I turn. This is the juvenile, H.C. He turns and sees Villanueva and Corona shooting, shooting Brewer on the ground. Again, the defense attorneys went into extensive cross-examination of that witness about his juvenile plea or his juvenile admission, the penalty that he faced. They had ample opportunity to discredit him. So once again, the evidence is in. There's testimony there. Tiffany Garnier is an individual who was with them. She didn't provide extensive details, but she did admit that she was the person who brought them there. I believe she also admitted that she was the one who located Vinnie Brewer, spotted him in the Boys and Girls Club parking lot, directed them to go in there. So there were several witnesses who provided very significant parts to the testimony and to the sufficiency of the evidence for convicting Villanueva for sure, but I guess both defendants at the trial of this matter. There's no expert testimony that was necessary. And again, this is under the precedent from this Court, from Keim and Nicholas. This expert's testimony was not even necessarily based so much on the facts of the case. She had a small amount of information and reached a conclusion that it had to be unreliable, that it was too suggestive. She was applying law enforcement standards to individuals who, well, certainly were not law enforcement and had nothing to do with law enforcement. I'm going to move on to the sentencing arguments for Mr. Becerra. Judge Shepard, I believe you asked the question specifically about where this was in the pre-sentence investigation report. Paragraph 14 of Becerra's pre-sentence investigation report, I believe the words were that four men got out of the car and carried weapons and pointed the weapons at Sky Brewer. No, those are not the words of paragraph 14. Am I citing the wrong paragraph? I'm sorry, Your Honor. I have notes for that. I don't know if you're citing the wrong paragraph, but the words you just stated are not in paragraph 14. But it does say initially the group pointed their firearms at a bystander. Sorry, it must be my paraphrase. My apologies. What I was trying to get at is that the group pointed firearms. So we're looking at, I believe on plain error review, we're looking at a situation where the defendant has to show that this fact or this factual finding by the district court affected his substantial rights. We've got the group, and we know who the members of the group were from the context of the trial. Say that again? What about substantial rights? He has to show that it affects his substantial rights. What affects his substantial rights? The error. Which error? Yes, it would be the factual error of that Esteban Becerra pointed a firearm at Sky Brewer. That was Judge Viken's finding that I believe is at issue here. And you're saying that was error? No, I'm saying if it's error, he has to show that it affected his substantial rights. That would be true, but I wondered why you were skipping to prejudice. So what's the government's current position on whether there was error? I don't believe there was error, Your Honor. The prosecutors in the brief responding to Mr. Becerra's post-sentencing motion did not contest that it may have been an error. But Judge Viken pointed out in his order denying the reconsideration of the sentencing, pointed out that, no, it was the group pointed firearms. The group would be HC, Villanueva, Corona, and Becerra. And I believe that, again, as I have it written down, that it was a group, and that Sky Brewer said that they all were pointing weapons at him initially when they got out of the car. At that point you can talk about prejudice, too, if you want, but I wanted to understand your position on error. Judge Viken made an extensive record of why he was sentencing Becerra to what he was sentencing him to. He looked at the nature and circumstances of the offense, talking about the danger and all of the things that occurred surrounding this murder, what Becerra did, including being part of the beating of Brewer, that he was, again, there with a firearm. The court looked at relative culpability, and it was trying to avoid unwarranted sentencing disparities. It was looking at levels of culpability. And while Tiffany Garnier and Becerra had two completely different roles, the court found that their levels of culpability were similar enough that it warranted the same sentence. The United States agreed that it was going to ask for a 12-year sentence, and it didn't view Garnier as having a higher level of culpability. But the district court had the authority and the ability to look into, look at the defendants and look at their situations and assess their relative culpability in a different way, and it did so. It noted that it needed a sentence that would have a deterrent effect. It talked about how Becerra had just gotten off parole two days earlier, and then this murder happens just shortly after that. It looked at his history and characteristics, his role in the offense. But it made extensive findings. It wasn't that the court just looked at this pointing of the gun and that that was the only thing that it based its sentence on. It was looking at an extensive record. It was quite a long sentencing hearing, and then even afterward, it wrote in its statement of reasons all the different things that supported the sentence that it imposed. Did the court draw an inference from testimony, or did somebody actually testify that Becerra had pointed a gun at someone? Based on what Judge Colleton read a moment ago, I'm going to be very careful. It was my understanding or my memory that Sky Brewer did say, four people got out and pointed guns at me. That would have been in the trial testimony, and that's where I must have paraphrased it. Well, you're referring now to what he testified to in the trial, not to the PSR. Is that right? Yes. But, again, it's my memory. When you corrected me earlier, I actually had it written down as if that was the way it was written in the PSR, and I apologize for that. But I think the testimony was that four men get out and the firearms are pointed at him. It's a brief statement, but it's enough that the district court could rely on it. And, again, that's one part of the entire sentencing where it cited numerous factors. It cited the fact that the district court believed that Bacara would have been convicted at trial if he had gone to trial on the first-degree murder charges against him. So he received a benefit, and that's something that under the sentencing statute, under 3553, the court is allowed to take into consideration dismissed charges and things that he did not face a penalty for. It only has to be the issue on this finding. I don't think the witness ever said all four were pointing rifles at me, but he did speak in terms of the group and what they did. And I guess you must be saying that it was not clearly erroneous to infer from that testimony that Bacara was pointing a gun. That's exactly the point, Your Honor. The point, Your Honor, is the group did it, and I believe it is clear from the evidence that there were four in the group, H.C., Bacara, Villanueva, and Corona. So the district court had a reasoned basis. It had enough before it to make that factual finding. And then when you go to the prejudice side of things, when you go to the other portion of it, it made a huge — it made a very extensive record with all of the reasons that it imposed the sentence, particularly under 3553 in the sentencing statute. But we don't have a — we don't have a finding by the — or a statement by the judge at any point where the judge says this played a small role in the sentencing or I would have found the same thing regardless of these findings or anything like that that would indicate the weight the judge put on it. That's correct. It's — in recent years, it's been something that I guess I've noticed a little bit more. It's not always something that happens at sentencing. It used to be much more frequent where the alternatives were found and where judges would say, I would do this regardless. But I don't believe that that happened here. I'm going to move on to the suppression issue. When that traffic stop occurred in Denver, this was — I think it was just days after this murder, if I remember correctly, they approached the vehicle, and it was something where the officers began looking at Mr. Corona immediately, but he was acting nervously. They saw his clothing, particularly his hat that was on his lap. They saw his tattoos. They were in a high-crime area, and I know that none of these things is necessarily the be-all and end-all of what would allow them to continue with the investigation. But they have a lot of factors. They have a lot of facts that were in front of them. He was — I believe he was shaking while he was in the car. But regardless, at some point, Corona gives a false name. And they're trying to ascertain who this individual is. Well, that false name affected where things went from there. Because he's giving a false name. He's got the clothing on. He's acting nervously. Terry and the cases that have followed Terry allow for even handcuffing of a defendant or of an individual at a scene, not a defendant necessarily, to allow the officers to maintain the status quo, to figure out what's going on, to dispel their suspicions and their concerns that they have going on. And the suspicions in this case did not begin to decrease. They kept on increasing by his actions. And the different things that Corona was doing, again, based on his nervousness, based on his attire, based on their location. These are officers who were experienced in the gang unit. They knew that — they knew from his tattoos, they recognized him, and they had a small conversation as they were walking away from the initial time where they met the individuals in the car. And one of the officers says to the other, is he an oldie? Is he going to run? They recognized him from his tattoos, or they recognized enough that they had concerns about him being a part of a gang. With that, they're unable to determine his actual identity based on the name that he gave. And so they come back, and they're now more concerned. Judge Strass, as you asked earlier, they now are wondering what's in the car. What is he hiding? Why didn't he just give us a name? Does he have warrants? Are there things that we need to be concerned about that are happening in that car? There's a characterization by the appellant that when they came back and they started having the conversation about a small frisk putting him in handcuffs, that there was force involved. It was actually not forceful. It was rather gentle. I don't want — maybe gentle might be too strong a word. But it was not a thing where he was being shoved around, where he was forcefully cuffed or anything like that. It was rather even slightly casual conversation. It didn't turn this into custody. It didn't turn it into custody under Terry and its progeny because they're trying to still figure out what's happening. They had concerns, and they expressed their concerns even at the suppression hearing. So he was not in custody? Not in custody. He was being detained while they're conducting their Terry stop. And he's being asked questions, not trying to find contraband or not trying to find evidence against him. They're trying to figure out what's in this car, where there's two men in the back seat, one of them acting very nervously, giving a false name, and there's a child in the back seat. Yeah, there were other individuals in the car, and they were allowed to stay there while a few questions were asked. But the officers didn't have reasonable, articulable suspicion about anything that they might be able to do with those other individuals in the car at that point. They're trying to figure out, is there a danger in there? Is there something that we need to deal with because of the child in the car or the other individuals? So they ask him, are there firearms or contraband in there? It's not an interrogation. It was, again, trying to conduct their Terry stop. I don't know what you mean by it was not an interrogation. I mean, it was designed to elicit information about whether there were guns or drugs in the car. It might be that it was not a custodial interrogation under Berkmer because it was a roadside traffic stop and it hadn't become a formal arrest. But isn't it an interrogation if you seek to elicit information about guns and drugs? Your Honor, I guess, yes. It's – I'm combining – I'm talking about one part. You really mean – When I should be – Okay, go ahead. When I should be combining – or when I should be talking about them together, it's not a custodial interrogation. I just – I skipped past the – that part of it. But he wasn't in – I mean, he was in cuffs, but they were trying to dispel what they had observed, what they knew or what they were concerned about. They're trying to do the Terry stop, and this was the way that they were able to do that. Under Liddell, this Court's precedent, 517F3-1007, cited in the United States Brief, I believe it was in the district court and magistrate judges' opinions as well, but the public safety exception does apply. They were talking about it from early on in this – early on once they were talking about the handcuffs and putting him in cuffs and just taking him out of the car and having him to the – at the patrol vehicle, they're concerned about the child in the car. They want to know what's in there, and they're asking simply for the purpose of getting to the bottom of that. They were not trying to – Getting to the bottom of what now? They were trying to – they were trying to figure out the safety and the safety concerns, dispel their concerns about safety for the – What was the concern about safety? The child in the car they were talking about. Because there was a child in the car? There was a child in the car. They had a – I mean, they're always – there's lots of traffic stops with children in the car. Sure. Is this a rule that whenever there's a child in the car, coral supplies? No. Or does there have to be some indication of risk to the child? I believe that's what they were trying to dispel, is all these other circumstances that went along with it, the false name and the clothing, the tattoos, the high-crime neighborhood. All of these things were combined with a child in the car. I just – I hadn't mentioned the child in the car earlier, but I believe that adds to what they were looking into. And the public safety exception does apply to circumstances where they are looking into protecting people, protecting other individuals even in that car, from what might be inside that car. Your Honors, based on these arguments, the United States asks that the convictions and the sentencing judgment be affirmed in all of these cases. Very well. Thank you for your argument. I think that Mr. Rohl had one minute left and the other's time expired, and I appreciate everybody may have wanted rebuttal, but we've ventilated the case quite a bit and we have good briefs on it, so let's just hear your one minute of rebuttal and then submit the case. Go ahead. Thank you, Your Honor. What happened? Why? Unreliable evidence went to the fact finder, unchecked. No dispute with Mr. Kelderman's set of facts presented to this court, Sands 2. This occurred at Mr. Brewer's funeral, and the presenter of the information was Mr. Brewer's sister. The presenter also provided names of the individuals in the photograph, submitted contemporaneously as it was a Facebook picture. So, option, keep it out versus or in addition to allowing expert testimony to be presented. It was not harmless. Mr. D'Souza was severely discredited. He's made a living doing this, essentially, in multiple murder cases. Mr. Casillas, his identity was wiped clean. He got $84,000 in compensation. Cross-examination was able to flush all that out except one thing, the science beyond the ken of the jury. That was never allowed to be presented to the jury, and for that reason, the unreliable eyewitness identification at issue went to the jury totally unchecked. Thank you. Very well. Thank you for your argument. Thank you to all counsel. The cases are submitted, and the court will file a decision in due course. Counsel Erkson.